IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE THE SEARCH OF:

Documents, records, files and data related to
Hertel & Brown Physical & Aquatic
Therapy dated between January 1, 2013 and
December 31, 2017 located within the
digital contents seized on February 23, 2021
from a laptop computer located at 902 West
Erie Plaza Drive, Erie, Pennsylvania

Magistrate No. 21-52
[UNDER SEAL]

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
SEARCH AND SEIZURE WARRANT**

I, Michael Thoreson, being first duly sworn, hereby depose and state as follows:

**Introduction and Agent Background**

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been so employed since February 2000.  As a Special Agent with the FBI, I perform and have

performed a variety of investigative tasks.  Since September 2011, I have been assigned to the Erie

Resident Agency in the FBI Pittsburgh Division.  Among other matters, I am currently assigned to

investigate anyone who knowingly or willingly defrauds or attempts to defraud any health care

benefit program, including cases involving criminal frauds perpetrated against various programs

funded by the United States Department of Health and Human Services and the Commonwealth

of Pennsylvania, including Pennsylvania's Medical Assistance ("PA Medicaid") program.[1]

2.     By virtue of my training and work experience, and through discussion with

experienced health care fraud and drug diversion investigators with the FBI, who work matters

---

[1] These crimes include Title 18, United States Code, Sections 287, 371, 669, 1035, 1341, 1343, 1347, 1349, 1956, and 1957; Title 21, United States Code, Sections 841 and 846; and Title 42, Section 1320a-7b.

involving health care fraud, I have become familiar with schemes to defraud health care benefit programs.

3.     I have knowledge of the facts set forth in this affidavit based on my own participation in this investigation, records reviewed including bank records and health insurance records, and based on information provided to me by others mentioned herein.

4.     Based on my training and experience and the facts as set forth in this affidavit, described below, I have probable cause to believe that Hertel & Brown Physical & Aquatic Therapy (HB), Aaron Hertel, Michael Brown and others working at HB have committed violations of 18 U.S.C. § 371, Conspiracy to Defraud the United States; 18 U.S.C. § 1035, False Statement Relating to Health Care Matter; 18 U.S.C. § 1343, Wire Fraud; 18 U.S.C. § 1347, Health Care Fraud, and; 18 U.S.C. § 1349, Conspiracy to Commit Wire and Health Care Fraud.  The offenses listed above are referred to collectively as the "Subject Crimes."

5.     I make this application and affidavit in support of a search warrant, under Federal Rule of Criminal Procedure 41 and 4.1, to search the digital contents of a laptop seized on February 23, 2021 from 902 West Erie Plaza Drive, Erie, Pennsylvania for Hertel & Brown Physical & Aquatic Therapy related documents, files, records and data dated between January 1, 2013 and December 31, 2017.

6.     I submit that there is probable cause to believe that the search of these documents, files, records and data, dated between January 1, 2013 and December 31, 2017, pursuant to Title 18, United States Code, Section 3103a, and Federal Rule of Criminal Procedure 4.1 and 41(c)(1), (2), and (3), will lead to evidence, fruits, and instrumentalities of the Subject Crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

7.     The information set forth in this affidavit is derived from the investigation conducted thus far by the FBI including: 1) interviews of confidential sources, witnesses, and other law enforcement officers; 2) review of Medicare and Medicaid claims data; review of records obtained through subpoenas, including but not limited to, private health care benefit plan claims data, bank, and other records; 3) review of source reporting documents; and 4) review of law enforcement databases.  Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant of the above-listed locations and items, this affidavit does not set forth every fact known to me or other agents during the course of our investigation of HB, Aaron Hertel, Michael Brown and others working at HB.  Rather, I have set forth only the facts that I believe are necessary to support probable cause.

## Background

8.     HB is owned by two partners, Aaron Hertel and Michael Brown.  According to HB's website, www.hertelandbrown.com/staff/aaron-hertel (last visited February 17, 2021), Hertel earned a Master of Physical Therapy degree from Gannon University in 2003.  Hertel co-founded HB after working as a facility director in outpatient physical therapy for three years.  The HB website lists several different specialties for Aaron Hertel which appear all related to different fields within physical therapy.  Hertel currently holds a Commonwealth of Pennsylvania physical therapy license, number PT016791, which was issued on February 23, 2004 and expires on December 31, 2022.  It was last renewed on November 23, 2020.

9.     HB's website lists Michael Brown as founding HB in 2007 after obtaining his Master of Physical Therapy degree from Gannon University in 2003.  Brown had inpatient and outpatient physical therapy experience before founding HB.   Brown currently holds a

3

Commonwealth of Pennsylvania physical therapy license, number PT016821, which was issued on March 8, 2004 and expires on December 31, 2022.

10. The HB website lists approximately 25 physical therapists or physical therapy assistants working at HB's five locations. The website also lists front office personnel and billing specialists. The website does not list aides or student interns.

11. I believe, based on information from CW1, CW2, CW3, CW4, CW5, CW6 and by the very nature of the Subject Crimes, that some, if not all, of the Subject Crimes were committed in the 902 West Erie Plaza Drive, Erie, Pennsylvania Laptop Contents.

12. CW1, CW2, CW3, CW4, CW5 and CW6 are cooperating witnesses with the FBI. CW1 is a former employee of HB who stopped working for HB around September/October 2020. CW2 is a licensed physical therapist who was interviewed by your affiant on January 27, 2021. CW3 is a licensed physical therapist currently working at HB, who has been interviewed twice by your affiant in January 2021. After the first interview of CW3, he/she obtained counsel and the government provided CW3 a proffer letter which indicates that in exchange for CW3 providing full, complete and truthful information concerning HB, Aaron Hertel, Michael Brown and others, the government will not use any of the statements made by CW3 pursuant to the agreement in a prosecution of CW3. CW4 works in a professional capacity for the City of Erie. CW4 has never been arrested nor charged with a crime. CW4 was interviewed by your affiant on February 11, 2021. CW5 is a licensed physical therapist currently working at HB. CW5 was interviewed by investigators on February 23, 2021 and again on February 25, 2021. CW6 is a former technician and physical therapist at HB who now works as a physical therapist for a different practice. He/she was a party to a lawsuit involving Aaron Hertel that was ultimately settled. CW6 was interviewed on March 2, 2021.

**Health Care Fraud**

13.     I have probable cause to believe that HB, Aaron Hertel, Michael Brown and others working at HB have committed health care fraud and other violations, including 18 U.S.C. § 371, Conspiracy to Defraud the United States; 18 U.S.C. § 1035, False Statement Relating to Health Care Matter; 18 U.S.C. § 1343, Wire Fraud; 18 U.S.C. § 1347, Health Care Fraud; and 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud.

14.     A person violates 18 U.S.C. § 1035 if they, in any matter involving a health care benefit program, knowingly and willfully – (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services. A person violates 18 U.S.C. § 1343 if they, for the purpose of executing a scheme to defraud, cause to be transmitted, by means of wire communication in interstate commerce, any writings, signs, signals, pictures or sounds in furtherance of their scheme to defraud.   A person violates 18 U.S.C. § 1347 if they knowingly and willfully execute, or attempt to execute a scheme or artifice:  (a) to defraud any health care benefit program; or (b) to obtain, by any means of false pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, as defined by 18 U.S.C. § 24(b).  A person violates 18 U.S.C. § 1349 if they attempt or conspire to commit wire fraud or health care fraud.

5

### Medicare, PA Medicaid, VA, and Private Health Insurance Plans

15.     Medicare is a federal health insurance program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services (HHS).  Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Medicare only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member.  *See* 42 U.S.C. § 1395(a)(1)(A).

16.     The Medicare payment system is comprised of four divisions, Medicare Part A (Hospital Insurance); Medicare Part B (Medical Insurance); Medicare Part C (Managed Care Program); and Medicare Part D (Prescription Drug Program).  Medicare Part A pays for inpatient hospital stays, skilled nursing facility services, home health services, and hospice care.  Medicare Part A payments are determined under a prospective payment system using the claims submitted by the provider for a particular patient discharged (specifically listed on UB-92s and UB-04s) during the course of the fiscal year.[2]  Medicare Part B pays for physician services, outpatient

---

[2] At the end of a hospital's fiscal year, the hospital files its cost report with the Medicare contractor, stating the amount of Medicare Part A reimbursements the provider believes it is due for the year, or the amount of excess reimbursement it has received through interim payments during the year that it owes back to Medicare. *See* 42 U.S.C. § 1395(g); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).  Medicare relies on the hospital cost reports to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  *See* 42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1).  On the hospital cost report, the prospective payments for services are added to any other Medicare Part A add-on payments due to the provider. This total determines Medicare's liability for services rendered to Medicare Part A beneficiaries during the fiscal year.  From this

hospital services, durable medical equipment and supplies, and other health services and supplies. Medicare Part C pays for managed care.  Medicare Part D pays for prescription drugs.

17.    Medicaid is a system of medical assistance for indigent individuals who are aged, blind, disabled, or members of families with dependent children.  Both the federal and state governments fund the program.  Pennsylvania Medicaid, also known as Medical Assistance ("PA Medicaid"), is a joint federal and state program, which is governed by the Pennsylvania Department of Human Services.  PA Medicaid purchases services through contracts with managed-care organizations and under an indemnity, or traditional, fee-for-service system.  CMS also monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.

18.    Medicare and Medicaid, along with private health insurance plans, such as Blue Cross/Blue Shield, Highmark and UPMC Health Plan, are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

19.    Healthcare providers are paid by Medicare and PA Medicaid (and other private health care benefit plans) through the submission of claims.  Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by the program's governing rules and regulations.  As a condition of payment, Medicare, PA Medicaid and private medical insurance companies require providers to certify all information on the claim is true, correct, and complete.  In addition, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or well-being of the patient.

sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare Part A program or the amount due to the provider.

Providers are also required to maintain all documents that substantiate claims for between four and six years.

20.     Similarly, PA Medicaid providers are required to create and maintain documents for at least four years supporting the claims submitted for reimbursement and must certify that the information on any claim for payment is true, accurate, and complete and Medicaid will only pay for medically necessary compensable services and items.  55 Pa. Code §§ 1101.51 and 1101.61.

21.     Medicare, PA Medicaid and private health insurance providers generally rely upon claims submitted, and the provider certifications made thereon, to reimburse providers for covered services.

22.     In order to participate in (and bill) Medicare, PA Medicaid, and private health care benefit plans, a provider (or hospital) must prepare an application for a provider number and be assigned a provider number.  The provider number must be used on all claims filed with the health care benefit program.

**Documenting Medical Services and Procedures**

23.     The American Medical Association (AMA) maintains the Current Procedural Terminology (CPT) coding system as a listing of descriptive terms and identifying codes, commonly referred to as "CPT codes," to describe medical services and procedures.  CPT codes are utilized by both public and private health care insurance programs to describe services and procedures provided and by extension, billed for.

24.     The Health Insurance Portability and Accountability Act of 1996 (HIPAA) established the use of a standard unique health identifier for covered health care providers known as a National Provider Identifier (NPI). Covered providers must share their NPI with other providers, health care plans, clearinghouses, and any entity that may need it for billing purposes.

As such, NPIs are included in payment for service bills, commonly referred to as "claims," submitted from covered medical industry providers to health insurance providers in order to seek reimbursement for services provided to beneficiaries.

25.    To receive payment from Medicare, a participating provider is required to submit claims for service to a designated administrative services processing company, who, in turn, administers a Medicare Administrative Contract (MAC) for a designated area. Claims are submitted electronically to the administrator either by the provider directly, or using a third-party biller. Claim information provided to the processing company includes, among other things:

      a.    the Medicare beneficiary's name;

      b.    the date of service;

      c.    the place of service;

      d.    the unique numerical procedure code (CPT) representing the service(s) rendered;

      e.    the number of units of a particular CPT therapeutic procedure provided;

      f.    the name and identification number of the rendering medical provider (NPI)

26.    The Medicare program, through its contractor(s), generally pays a substantial amount of the cost of therapy services represented by the provider to be reasonable and medically necessary.  Since procedure code(s) and units of service are factors in determining reimbursement amounts, representation of services provided are material elements of each and every claim.

27.    As a condition for enrollment, Medicare requires providers to attest to their meeting and maintaining Medicare requirements, including abiding by Medicare laws, regulations, and program instructions, which are available through the Medicare contractor.   Furthermore, providers attest to their understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program

instructions, and on compliance with all applicable conditions of participation in Medicare.

28.     Medicare also requires providers to identify as a condition for enrollment the specific location where patient records will be maintained.

29.     Once enrolled in the Medicaid program, providers are issued manuals and updates (provider bulletins) which explain how to bill the Medicaid Program, as well as explaining other information pertinent to acting as a Medicaid provider.

30.     To receive reimbursement from Medicaid, providers report services performed on and rendered to patients by submitting claims for reimbursement of medical care and services, by either hard copy or by electronic means, to the fiscal agent.  Claim information transmitted to the fiscal agent includes, among other things:

       a.     the recipient's name and identification number;

       b.     the date of service;

       c.     the place of service;

       d.     the unique numerical procedure code (CPT code) representing the services rendered;

       e.     the number of units of a particular CPT therapeutic procedure provided; and

       f.     the name and identification number of the rendering provider.

31.     As with Medicare, a provider's representation of services is a material factor in amounts reimbursed by the Medicaid program. Private health insurance providers also require similar credentialing and reporting of claims in order for the health care provider to obtain reimbursement for services provided.

## **Investigation**

32.     On April 13, 2016, United States Department of Health and Human Services Office of Inspector General (OIG) received a complaint from an individual that identified himself/herself

as a current or former employee of HB.  The complainant stated Aaron Hertel and Michael Brown are the owners of HB.  The complainant revealed HB was using unlicensed physical therapy (PT) techs (aides) and students to provide services, such as ultrasounds and setting patients on electric stim (stimulation), and billing Medicare and Medicaid and other insurances for the services provided.  The complainant advised this had been ongoing for years.  OIG closed the matter due to a lack of evidence.  This complaint came to the attention of the FBI in January 2021.

33.     Sometime in 2020, your affiant received a tip that HB was utilizing supportive personnel and not licensed physical therapists during pool rehabilitation therapy sessions. Although an investigation into the HB matter was not opened in 2020 due to lack of corroboration and other evidence, the tip provided at least an initial indication to the FBI in Erie that HB may be engaged in criminal activity.

34.     In November 2020, the FBI in Erie opened a health care fraud investigation of HB, Aaron Hertel, Michael Brown, and others working at HB after CW1 came forward with allegations that HB, Aaron Hertel and Michael Brown had engaged in a pattern and practice of filing false claims for payment to the United States related to HB's physical therapy practice.

35.     CW1 revealed that he/she had worked for HB as a non-licensed employee.  CW1 called himself/herself an aide.  CW1's duties included assisting patients with treatment along with preparing and cleaning equipment.  At the time of his/her employment at HB, CW1 was also employed at a different physical therapy practice.  As an aide at this other physical therapy practice, CW1 was not allowed to perform treatment on patients.  CW1 was told by the other physical therapy practice that as a non-licensed aide, CW1 was not allowed to provide physical therapy treatment to patients.  CW1 has revealed to your affiant that this was the opposite of the training and guidance provided by HB.  While at HB, CW1 was authorized by HB to, and in fact did,

provide physical therapy treatment to patients. Despite working at HB as an unlicensed aide, CW1's physical therapy treatment of patients was billed by HB as if CW1 was a licensed physical therapist. CW1 revealed that aides, like himself/herself were engaged in physical therapy on patients on a regular basis and as a way of doing business. According to CW1, HB schedules numerous patients each day, who they would not be able to treat within the workday without the unlicensed aides performing some of the physical therapy treatment that is required to be performed by licensed physical therapists.

36.    In January 2021, your affiant contacted CW2 who agreed to provide information about the physical therapy profession. CW2 has been involved in the physical therapy profession for many years, and has practiced as a licensed physical therapist, providing treatment to patients and billing private medical insurance and Medicare for those services. CW2 is currently a licensed physical therapist in Pennsylvania.

37.    CW2 is familiar with the curriculum taught to physical therapy students at Gannon University in Erie, Pennsylvania. CW2 informed your affiant that a large percentage of physical therapists in the Erie area are graduates of Gannon University. Graduates of Gannon are provided with instruction on Pennsylvania physical therapy rules and guidelines. Each state is different, but physical therapy offices in Pennsylvania must operate under Pennsylvania laws, Medicare and Medicaid guidelines, and rules set forth by each medical insurance company or agency they bill. CW2 has indicated to your affiant that physical therapy students receive this instruction, so they understand what tasks technicians (aides/supportive personnel), physical therapists, and physical therapist assistants are allowed to perform. According to CW2, physical therapists and physical therapist assistants are expected to know the parameters of allowable treatment and how to properly bill for services rendered. CW2 stated that under no circumstance can a physical therapist

or physical therapist assistant use the excuse that they were never informed/educated about the differences in allowed treatment and proper billing.  Physical therapists and physical therapist assistants are licensed by the Commonwealth of Pennsylvania and physical therapists and physical therapist assistants are taught in college the standard procedures of allowed treatment and billing.

38.    CW2 advised your affiant that a technician or aide's labor cost is cheaper than a physical therapist or physical therapist assistant.  A physical therapist can earn over $60,000, with a physical therapist assistant earning approximately half that amount.  A technician or aide on the other hand may earn minimum wage, as they do not have a physical therapy degree or a license to practice physical therapy.  According to CW2, technicians/aides have a purpose in a physical therapy practice and are allowed by Medicare, Medicaid, private insurance  and Pennsylvania to welcome patients and take them to exam rooms, clean and prepare exercise equipment, and undertake any other functions that might be performed by a non-physical therapist employee.[3]

39.    CW2 revealed that both Pennsylvania and Medicare have rules and guidelines for physical therapists.   The Pennsylvania physical therapy rules are part of Title 49 of the Pennsylvania Code.   This code provides instructions and guidance on licensing of physical therapists, physical therapist assistants, and aides, along with the various rules and regulations for the physical therapy practice.

40.    For an aide or technician role in a physical therapy business, (Pennsylvania Code calls them supportive personnel), Pennsylvania Code, Title 49, Section 40.31a specifies that supportive personnel shall identify themselves to patients as supportive personnel.  "A physical

---

[3] The term technician herein includes the term aide and supportive personnel and generally describes those employees at a physical therapy practice who are not licensed and have not obtained the requisite training and education to be a licensed physical therapist or physical therapist assistant.

therapist may only allow supportive personnel to perform patient-related activities which do not require the formal education or training and the skill and knowledge of a physical therapist, or physical therapist assistant, and only while the supportive personnel are under the direct on-premises supervision of a physical therapist." 49 Pa. Code § 40.32(a). Further, a physical therapist may not permit supportive personnel to provide physical therapy services.  49 Pa. Code § 40.32(b). Section 40.32 identifies the specific assistance physical therapists may permit supportive personnel to perform as well as the assistance physical therapists may not permit supportive personnel to perform, such as documenting physical therapy treatment or assuming responsibility for patient care.  49 Pa. Code § 40.32(b)-(c).  A physical therapist is subject to disciplinary action if a physical therapist assigns or delegates to physical therapist assistants or supportive personnel anything prohibited under § 40.32.  49 Pa. Code § 40.52.

41.    Medicare has its own rules and guidelines specifying that all state guidelines need to be followed, and if stricter, the state guidelines shall take precedence.  Medicare Benefit Policy Manual Chapter 15 (www.cms.gov/regulations-an-guidance/guidance/manuals/downloads/bp102c15.pdf), updated August 7, 2020, Section 230 B - Therapy Students, states the following: "Only the services of the therapist can be billed and paid under Medicare Part B.  The services performed by a student are not reimbursed even if provided under "line of sight supervision of the therapist; however, the presence of the student "in the room" does not make the service unbillable."

42.    Furthermore, Section 230.1, which references 42 C.F.R. 484.4 states the following: "a qualified physical therapist (PT) is a person who is licensed, if applicable, as a PT by the state in which he or she is practicing unless licensure does not apply, has graduated from an accredited PT education program and passed a national examination approved by the state…"

43.     Section 230.1 continues with: "Services provided by aides, even if under the supervision of a therapist, are not therapy services and are not covered by Medicare.  Although an aide may help the therapist by providing unskilled services, those services that are unskilled are not covered by Medicare and shall be denied as not reasonable and necessary if they are billed as therapy services."  In summary, no matter what an aide does, even if they were to successfully perform a "brain surgery" themselves, they are unlicensed and untrained employees in the eyes of the law.  Pennsylvania and Medicare do not allow physical therapist aides to bill the kinds of services detailed in this affidavit.

44.     According to CW1, HB utilizes a software program called WebPT.  The website for WebPT, www.webpt.com, markets itself as the "most-trusted software in outpatient rehabilitation, with everything you need to run a successful practice, to include scheduling, billing software, patient records, and analytics (intelligence with real-time data reporting)".  WebPT's corporate headquarters is in Phoenix, Arizona.  Since WebPT is an internet-based business, HB most likely pays a monthly or yearly subscription for both software access and data storage.  According to WebPT's website, the company offers rehab therapy professional web-based software to facilitate scheduling, documentation, billing, outcomes tracking, business reporting, and system integrations software.  A WebPT user can log on to their account "anywhere, from any web-enabled device."  The service allows the user to securely enter and save patient data anytime, anywhere.  The electronic medical records (EMR) function allows the WebPT user to create and send specialty-specific documentation, including initial evaluations, progress notes, daily notes, customizable flowsheets, and discharge summaries.

45.     It is expected that WebPT will also have additional information regarding use of the account.  In general, providers like WebPT ask each of their subscribers to provide certain

personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

46.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

47.     CW1 and CW3 have revealed that each HB location/office utilizes computers that run WebPT. CW1 provided photographs he/she took of the morning schedules for three separate days at the Summit HB office. These photographs were of a computer monitor that displayed an electronic schedule that included patients' names, the time of their appointment, and the physical therapist assigned. In the background of the photographs, your affiant can clearly see photographs hung on walls and post-it-notes stuck on walls with various writings, including, "Keep Monday's

Schedule light!"   The photographs depict what looks like an office setting.   In one of the photographs, your affiant can see a business card for HB.   Three employees, two physical therapists and one physical therapist assistant, are listed on the schedule photographs provided by CW1. Each patient on the schedule is then listed under a physical therapist or physical therapist assistant's name.   The schedule provided by CW1 showed the first patient was to be seen at 8:00 a.m.   While the Summit HB office was open for longer than just in the morning, the photographs only include the morning portion of the schedule.    Numerous patient appointments are on the schedule provided by CW1.   No open time, breaks, or off time is labeled or observed on the schedules for each employee.   CW1 also provided photographs of the morning patients' "flowsheets."   A "flowsheet" is a WebPT produced document that includes the name of patient, health insurance provider, reasons for visit, treatment of patient, minutes spent with patient, and the CPT billing code for each patient.   In general, the "flowsheet" is a complete detailed description of what took place during the patient's visit.

48.     Your affiant examined each "flowsheet" provided by CW1, the CPT codes billed for each patient as indicated on the "flowsheets," and the total time the physical therapist spent one-on-one with each patient (as indicated on the "flowsheet").   As part of each "flowsheet," an HB employee documented how many minutes were spent with the patient.   Total minutes with patients are directly proportional to revenue (detailed further within this affidavit).   Total minutes of treatment are one of the most critical avenues of income for a physical therapy practice. Treatment minutes can make or break a physical therapy practice.   If you do not treat enough patients each day, nor spend enough time with them, the business runs the risk of not being profitable.   This investigation has focused on how HB employees recorded treatment minutes and whether those documented records were done correctly and accurately.   For each patient's

"flowsheet" provided by CW1, investigators totaled and separated the recorded total minutes of treatment according to the physical therapist/physical therapist assistant listed as administering treatment.   The results were as follows for the July 6, 2020 schedule from approximately 8:00 a.m. to 12:00 p.m.:

> a.   July 6, 2020:  Physical Therapist A.D. – Total time billed 10.4 hours
>
> b.   July 6, 2020:  Physical Therapist Assistant L.G. – Total time billed 6.1 hours
>
> c.   July 6, 2020:  Physical Therapist J.M. – Total time billed 6.75 hours

49.    Therefore, as observed in the data provided by CW1, on July 6, 2020, the three employees working the morning shift at HB, A.D., L.G. and J.M., recorded and billed health insurance providers a combined total of over 23 hours of one-on-one services during the morning time frame of 8:00 a.m. through around 12:00 p.m.  The three licensed HB employees claimed they had been in direct one-on-one contact with their patients for over 23 hours during the four-hour window (12 total hours of possible billable time – 3 employees multiplied by 4 hours) for the morning of July 6, 2020.

50.    CW2 has informed your affiant that patient billable time is recorded by the physical therapist or physical therapist assistant performing the treatment/therapy.  Per Medicare rules and guidelines, a physical therapist or physical therapist assistant can treat multiple patients at the same time, but if one-on-one services are being billed for each, then the physical therapist or physical therapist assistant must be with each patient for the time they documented.  One-on-one service is defined as continuous direct contact with the patient.  Insurance providers allow physical therapists or physical therapist assistants to round time to the nearest 15-minutes if they meet the 8-minute rule.  For example, if a physical therapist treats a patient for 12 minutes, they may round the time up to 15 minutes and bill for 15 minutes.  CPT codes such as 97110, 97140, 97150, and 97113, are

reimbursed in 15-minute increments.  However, if a physical therapist sees a patient for 18 minutes, they must round down to 15 minutes.  If a physical therapist engaged in one-on-one treatment with a patient for 23 minutes, they could then bill that time as 30 minutes.  However, if the time spent by the physical therapist is only 22 minutes, that time should be billed only as 15 minutes because 8 additional minutes of treatment time did not occur.  CW2 stated to your affiant that when a physical therapist moves from one patient to another, they must "stop" the billable clock for the first patient.  The physical therapist then begins the clock on the next patient.  The physical therapist may go back and forth, each time starting or stopping the billable clock.  In this way, multiple patients can be seen at the same time.  However, when moving to a different patient, a technician may not continue the physical therapist's clock by just being present with the first patient.  CW2 also advised that a technician may be with the patient and help count exercise reps for example but cannot provide skilled (billable) instruction.

51.     Therefore, per Medicare and private health care insurance provider rules and common sense, a combined total of 23 hours of one-on-one billed services in a four-hour time window (12 total hours of possible billable time) is impossible and represents an example of fraudulent billing indicative of the pattern and practice of billing at HB.

52.     CW2 advised there is a legitimate way for physical therapists to treat multiple patients simultaneously.  This is performed through group therapy.  Group therapy is when a physical therapist treats more than one patient at a time and provides instruction to each or all at the same time.  Group therapy can be beneficial in that more revenue can be collected versus treating one patient at a time.  CW2 advised it would be unusual for a physical therapy practice not to bill group therapy.

53.     CW2 also indicated to your affiant that billing for a combined total of 23 hours of one-on-one services in a four-hour window, as was done at HB on July 6, 2020, is impossible. CW2 advised that physical therapy practices make money by seeing patients, and by increasing the patients treated, they bring in more revenue.   Although a single physical therapist simultaneously seeing multiple patients and billing them all as one-on-one services would bring in more revenue than group therapy, it would be illegal according to CW2 and the relevant statutes. CW2 advised that in his/her experience, the only way the three July 6, 2020 HB employees could bill a combined total of 23 hours in a four-hour window is by not performing services as documented or if their time was not actually spent with each patient as documented, i.e., technicians were utilized in lieu of the three licensed physical therapists or physical therapy assistants.

54.     CW1 has revealed that aides (technicians) are utilized in lieu of physical therapists during aquatic (pool) therapy sessions at HB.   Some patients need to use the pool for their rehabilitation and, according to CW1, the non-licensed aides (technicians) provide the guidance and instruction.   According to CW1, physical therapists or physical therapist assistants are almost never in the pool or in the pool area during aquatic therapy.   CW3 told your affiant the same information as CW1, that aides (technician or support personnel) administer pool therapy treatment while physical therapists or physical therapist assistants are with other patients within the building. CW3 has revealed that once the aide's work is done, the patient's insurance is billed as if a physical therapist or physical therapist assistant performed the pool therapy.   Furthermore, CW3 also revealed his/her knowledge that each HB location operates in the same manner, each location utilizes aides (technicians) with patients and bills that time as if it was performed by physical therapists or physical therapy assistants.   Your affiant reviewed the schedule for July 6, 2020 and

noted aquatic therapy (CPT code 97113) was billed for at least one patient.  The patient's appointment was at 10:30 a.m. on July 6, 2020.  The physical therapist (A.D.) billed Medicare for 48 minutes of aquatic therapy for this patient.  Also, on July 6, 2020, the same physical therapist (A.D.) had a 9:30 a.m. appointment that was billed for 47 minutes and a 10:00 a.m. appointment that was billed for 42 minutes.  Each of these segments of minutes were billed as direct one-on-one contact by the physical therapist (A.D.).  These billed time spans overlap each other.  These billings illustrate that HB physical therapist A.D. claimed to be in the pool administering one-on-one treatment to a patient while he/she was also administering one on one treatment to another patient at the same time.

55.    CW2 has informed your affiant that aquatic therapy can help patients with rehabilitation.  However, aquatic therapy can be expensive as a pool requires infrastructure and can have significant overhead.  CW2 advised that technicians are not allowed to be the sole provider of services for aquatic therapy patients.  While the technician could watch over the patients for safety, they cannot provide skilled billable instruction or treatment.  CW2 told your affiant that no matter what a technician did in a therapy pool, their time is not billable under CPT codes such as 97110, 97140, 97150, or 97113 (aquatic therapy).  CW2 told your affiant it would be fraudulent to document that a physical therapist or physical therapist assistant performed the aquatic therapy (billable time) when in fact the technician performed the instruction/therapy.  Furthermore, Medicare rules and guidelines state the following: "Aquatic Therapy with therapeutic exercise (97113) should not be billed when there is a not one-on-one contact between therapist and patient".  Medicare Benefit Policy Manual Chapter 15

56.    CW1 has also provided scheduling documentation and "flowsheets" for each patient treated at HB's Summit office on the mornings of March 9, 2020 and July 30, 2020 (8:00

a.m. to 12:00 a.m.).[4]  Your affiant once again separated and compiled the data for these two

morning shifts.  The results are as follows:

     a.     July 30, 2020: physical therapy assistant L.G. – Total time billed 5.2 hours

     b.     July 30, 2020: physical therapist J.M. – Total time billed 5.4 hours

     c.     March 9, 2020: physical therapist A.D. – Total time billed 7.6 hours

     d.     March 9, 2020: physical therapist assistant L.G. – Total time billed 8.4 hours

     e.     March 9, 2020: physical therapist J.M. – Total time billed 5.75 hours

57.     Just like with July 6, 2020, a billing analysis for July 30, 2020 and March 9, 2020

revealed billed hours above that of a four-hour billable window (8 hours of possible billable time

for July 30, 2020 – 2 employees times 4 hours, and 12 hours for March 9, 2020 – 3 employees

times 4).  For July 30, 2020, a combined total of 10.6 hours was billed in a four-hour window.  On

March 9, 2020, a combined total of 21.75 hours was billed in a four-hour window.

58.     CW2 was presented with the facts for all three morning schedules CW1 provided

(March 9, July 6, and July 30, 2020).  CW2 advised that after doing the math and trying to come

up with a scenario of where the physical therapist or physical therapist assistant moved back and

forth, patient to patient, allowing for unbillable time like placing a heat pack on a patient, CW2

could not see how a physical therapist or physical therapist assistant could legitimately bill this

therapy as one-on-one services.  For example, on July 6, 2020, the physical therapists billed 137

minutes in a 90-minute time slot.  CW2 advised not only are the billable times suspect, but there

[4] In at least one of the photographs of the HB morning schedule that CW1 provided, the
photograph was zoomed out enough to allow your affiant to see the office had patient
appointments in the afternoon.  Thus, your affiant knows that the morning billable hours did not
also cover or extend to times after 12:00 p.m. because HB had different patients being treated in
the afternoon.

is no open schedule to allow for physical therapist documentation, restroom breaks or food breaks. CW2 indicated that the data provided by CW1 about HB's billing demonstrates that HB's billable time is not realistic.

59.     Online publications, articles, Medicare guidelines, and even the website for WebPT, HB's EMR provider, all provide guidance and rules for one-on-one patient services. WebPT's website, www.webpt.com/blog/one-on-one-services-vs-group-services offers the following statement in one of its articles:

   a. "One-on-one services—a.k.a. individual therapy—are defined by direct one-on-one patient contact. So, if you bill using one-on-one codes, you're telling Medicare you definitely had one-on-one contact with that patient. Additionally, as Deb Alexander explained during her presentation at Ascend 2015, one-on-one CPT codes are cumulative, require constant attendance, and are time-based..."

60.     The American Physical Therapy Association's (APTA) website, www.apta.org provides billing descriptions and examples of appropriate methods for billing one-on-one services. The language offered by APTA along with their examples of how to bill, illustrate that physical therapists can bill Medicare for one-on-one services when the physical therapist is handling multiple different patients at the same time. APTA advises that the physical therapist must record time spent with each patient, and when the therapist moves their treatment to a different patient, the therapist's billable time with the first patient ends. No additional billable time can be allocated to the first patient until the physical therapist goes back to that first patient to perform treatment once again. Simultaneous one-on-one billing of more than one patient is not allowed or lawful.

61.     During this investigation, your affiant easily found physical therapy articles, notes, and guidance on the Internet.  Your affiant is not a trained physical therapist, but your affiant easily found the information.  Each article and document said the same thing, one-on-one services billed to Medicare must be performed by a licensed physical therapist or physical therapist assistant.  No unlicensed individuals can be used to bill Medicare or insurance providers.   The Commonwealth of Pennsylvania is also clear in its language, support personnel cannot perform treatment on a patient and certainly cannot then bill that treatment as if it was performed by a physical therapist or physical therapist assistant.

62.     During this investigation, patient billing records have been obtained for HB from UPMC, Highmark, Medicare, and Medicaid pursuant to requests made to each agency as allowed under the Health Insurance Portability and Accountability Act.  The records included those patients that had respective health insurance and/or for which HB employees submitted a charge/bill.  All four health insurance providers supplied records from 2014 through mid-2020.

63.     Your affiant examined over 30 of the patient "flowsheets" CW1 provided and compared them with the insurance provider billing data.  Your affiant compared the patient name, CPT code, units (minutes), insurance provider, and treatment date to determine if they agreed with each other.  The analysis revealed each patient's "flowsheet" listed the exact data that was billed to the insurance provider.  For example, according to the "flowsheet" and schedule provided by CW1, patient "Bob" was seen at the HB Summit location on July 6, 2020 (patient name changed to protect the identity of the patient).  The "flowsheet" listed CPT code 97110, 97140, and G0283 were performed by an HB employee.  The supervision/treatment of "Bob" was listed as being done by "1:1 w/Therapist" (i.e., one-on-one with licensed physical therapist).  The Highmark Insurance records matched "Bob's" "flowsheet", with "Bob's" Highmark Insurance plan billed for CPT

97110, 97140, and G0283.  In conclusion, all the "flowsheet" data that CW1 provided contained data that was actually billed to an insurance provider.  This revealed to investigators that the data CW1 provided is authentic and a true representation of the kind of documents and billing HB produces and submits to medical insurance agencies and companies.

64.    As detailed previously in this affidavit, certain insurance billings (CPT codes) are broken into 15-minute units.  For these types of billings (CPT codes), every 15 minutes spent treating a patient one-on-one will cause the insurance provider to reimburse the physical therapy practice at the rate that provider has established.   Each insurance provider's reimbursement rates are slightly different, but the 15-minute unit stays the same and is the industry standard.   The UPMC, Highmark, Medicare, and Medicaid billing data revealed only the reimbursement, the units billed and not the exact minutes spent.  Using the health insurance provider records, your affiant can only estimate the time spent with a patient.  For example, if a patient was billed by a physical therapist for one unit, then your affiant estimated the physical therapist spent 15 minutes with that patient.  Medicare rules state the time spent with the patient could have been anywhere between 8 and 21 minutes, but your affiant utilized the 15-minute increment as this was the standard set by Medicare and should be a reasonable overall approximation of the total time spent with all patients (law of averages).   To summarize, if an insurance provider's data revealed that a physical therapist billed for five separate billings on January 1st, your affiant calculated that 75 minutes of billable time was administered and billed by the physical therapist (15-minutes multiplied by 5).

65.    Due to Medicare rules and guidance, physical therapist assistants use a physical therapist's billing number (known as National Provider Identifier (NPI)) when they themselves bill for services.   Per rules set forth by Medicare and Pennsylvania, physical therapists are "responsible" for work performed by a physical therapist assistant.  A physical therapist assistant

works under the guidance of a physical therapist.  Every physical therapy practice must have an appropriate number of physical therapists employed at the practice.  However, the physical therapist assistant should still document in the patient notes that they were the one who actually performed the treatment.  The records received from the four health insurance providers are only billing records and only include physical therapist NPI's.  However, the analysis set forth in this investigation took into account that physical therapist assistants were not listed in the provider data.  While it is possible employees may move around HB locations, CW3 has revealed to your affiant that HB's website employee list is an accurate representation of which employees worked at a location on any given day.

66.     When your affiant did the analysis of total billed hours for each HB location, your affiant utilized HB's website to include the proper number of qualified licensed physical therapists who could have billed.  For example, if your affiant's data analysis revealed the four HB website listed physical therapists for a particular HB location each billed 20 hours in a given day, your affiant adjusted that data to also account for the two physical therapy assistants who worked at that HB location.  By including the physical therapy assistants who were also working, the data then revealed a more accurate indication of the hours billed by the physical therapists.  By not including each and every licensed employee, (physical therapists and physical therapy assistants), the data analysis may be misleading and inaccurate.  Thus, your affiant is requesting authorization to obtain the flowsheets from the HB locations in order to ensure that any data analysis of billing uses the most accurate information possible and does not just rely on the billings submitted to the insurance companies.  By obtaining the flowsheets from the HB locations, your affiant can take an additional step in the analysis and determine the actual minutes spent with each patient without having to rely solely on the 15-minute increments in which insurance providers are typically billed.  In this way,

HB will benefit because any analysis of the data will include the most accurate indication of time actually spent with each patient.

67.     As illustrated by the "flowsheets" provided by CW1, a search of HB and WebPT records and procurement of the flowsheets should allow investigators to determine the "exact" recorded times that HB employees spent administering one-on-one services with patients.  The current health insurance provider data gives a ballpark range, but with "exact" times, investigators should be able to pinpoint how long a patient was treated ("exact" is relative since both CW1 and CW3 have stated that physical therapists and physical therapist assistants are recording time spent with patients even though an aide or technician is sometimes administering treatment).

68.     The data provided by the four health insurance providers, Medicaid, Medicare, UPMC and Highmark, is voluminous and is by far the largest data set your affiant has ever analyzed.  For example, even with partial data for 2020, HB billed insurance providers over 100,000 times.  Combining years 2014 through 2020, there are over 900,000 billings.  Due to the immense number of records, it is impossible to determine the exact number of clients HB has seen over the years.  Whatever that figure is, it is most likely in the thousands.  As evidenced by the data and the schedules provided by CW1, your affiant knows the daily number of patients treated each day is large.  During the data analysis, significant information was discovered.  For years 2014 to mid-2020, only three group therapy CPT 97150's were ever billed by HB.  That was in 2014. Each year afterwards, not one HB employee ever billed CPT 97150.  According to WebPT, and an article on their website, www.webpt.com/guides/cpt-codes/, CPT 97150 is one of the top 20 CPT codes recorded by WebPT clients between September 2019 and February 2020.  These other WebPT clients frequently billed CPT 97150, but HB did not.

69.     CPT code 97150 is an untimed code.  This means that when a physical therapist performs treatment to a group of patients, as CPT code 97150 was designed to allow, each patient can only be charged one instance, regardless of how much time was spent with the physical therapist.  In 2014, Highmark reimbursed physical therapists $18.00 for each billing of CPT 97150.

70.     Two one-on-one CPT codes that could be utilized by a physical therapist in lieu of CPT 97150 are 97110 and 97140.  CPT 97110 is defined by the American Medical Association (AMA) as "Therapeutic procedure, 1 or more areas, each 15 minutes: therapeutic exercises to develop strength and endurance, range of motion and flexibility."  The AMA further states the "physician or other qualified health care professional (i.e., therapist) required to have direct (one-on-one) patient contact."  CPT 97140 is defined as "Manual therapy techniques (e.g., mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes".  CPT 97140 is also defined as one-on-one direct patient contact.

71.     In 2014, Highmark reimbursed physical therapists for CPT 97110 at a rate of $27.00 for every 15 minutes spent with a patient.  CPT 97140 was reimbursed at $28.98 for every 15 minutes.

72.     Revenue is an important part of any physical therapy practice.  A physical therapy practice could dramatically increase their revenue by performing just one-on-one services.  For example, in 2014, four patients seen at the same time by one physical therapist would bring in $72.00 (4 multiplied by $18.00) for 15 minutes of treatment using group therapy (CPT 97150).  If that same physical therapist instead billed one-on-one services (97110 or 97140) for each patient, they could bring in $108.00 for 15 minutes of work.  However, this would require the physical therapist to claim he/she was treating four different patients at the same time.  This again is physically impossible; no person can break themselves into four different entities.

28

Notwithstanding the illegality of one-on-one billing for multiple patients simultaneously, if a physical therapist instead billed CPT code 97110 or 97140 for 30 minutes each, income is then increased to $216.00, while 30 minutes of group therapy remains at $72.00.

73.    Billing exclusively 97110 or 97140 throughout the day would make a drastic difference in profitability.  HB locations could bring in hundreds or thousands of dollars extra each day.  Multiply that by weeks or months, and the exclusive use of one-on-one billing codes increases revenue exponentially.  A downside of billing one-on-one codes, however, is that HB would need to pay an aide, while in group therapy, no aide would be required.  As noted previously, a physical therapist's salary is significantly higher than an aide's or technician's salary.  Thus, there is a significant profit motive for a physical therapy practice to utilize physical therapy aides or technicians to perform the work legally reserved for only physical therapists and then bill that work as if a physical therapist performed it.  In doing so, a physical therapy practice illegally reaps the higher bills of a physical therapist while saving money paying an aide or technician.

74.    As referenced, CW2 informed your affiant that it would be strange for a physical therapy practice not to utilize or bill group therapy.  Furthermore, CW2 explained when done legally, group therapy will bring in more revenue than treating one patient at a time.  However, as noted and calculated, when one-on-one billing is done fraudulently as HB has been doing, group therapy billing does not even come close to bringing in the same revenue as fraudulent one-on-one billing.

75.    The data analysis revealed that HB most often billed 97110 and 97140, which are one-on-one CPT billing codes.

76.    Online source, www.physicaltherapy.com, and the article www.physicaltherapy.com/articles/medicare-part-b-coding-and-3841 (last visited February 9,

2021) provide the following: "CPT 97110 Therapeutic Exercise. Therapeutic Exercises are used for the purpose of restoring strength, endurance, range of motion, flexibility, where loss or restrictions is a result of a specific disease or an injury and has resulted in a functional limitation. It is also a 15-minute code. Exercises may be active, active-assistive or passive. Therapeutic Exercises require the unique skills of a therapist to evaluate the patient's abilities, design the Therex program, instruct the patient, and/or instruct the caregiver how to complete those exercises. However, after that teaching has been successfully completed, repetition of those exercises or monitoring for completion of the task in the absence of additional skill care would not be covered."

77.     The www.physicaltherapy.com article continues by stating that once the patient is able to safely exercise, no longer requiring any sort of frequent assessment or progression, even if set up is required, that exercise now becomes an independent program and it's no longer covered by Medicare.   In summary, a physical therapist cannot claim an aide or technician was overseeing a patient's exercise program that was designed by a physical therapist.  A physical therapist must be present and once a physical therapist's trained guidance is no longer necessary, therapeutic exercise (97110) is no longer covered by Medicare.

78.     When patients and health insurance providers pay for services rendered by a physical therapist, they expect a highly trained licensed professional who has undergone four years of college, plus another three years of specialized training.  Licensed professionals are regulated in every facet of society, and for good measure.

79.     Investigators analyzed multiple days within the total universe of approximately 900,000 billings and sorted them by office locations.  Separating by each location and then factoring in the number of physical therapists and physical therapist assistants at each location,

investigators were able to come up with an approximation of hours worked per physical therapist or physical therapy assistant.  The results revealed many instances where physical therapists or assistants billed more than eight hours per day, sometimes billing ten-hour days.

80.     Investigators then examined the health care providers that were billed on March 9, 2020, July 6, 2020 and July 30, 2020.  For July 6, 2020, investigators found 25% of the patients had insurance other than UPMC, Highmark, Medicare, or Medicaid.  For July 30, 2020, it was over 50%, and on March 9, 2020, it was 38%.  HB bills more medical insurance providers than just UPMC, Highmark, Medicare, and Medicaid.  In conclusion, your affiant believes the FBI is missing approximately 25-50% of the health insurance records that HB has ever billed.

81.     Based on the above analysis, investigators do not have a complete picture of HB billings for each and every day.  What the above analysis does show is that the numerous eight-hour billable days found in the analysis of the information from the four reviewed medical insurance providers is just the tip of the iceberg.  Applying this missing 25-50% to the known eight-hour plus workdays, as described above, investigators believe HB employees are billing upwards of ten or twelve hours per day (eight hours multiplied by 25% and 50%, respectively). Furthermore, by adding non-billable time, like bathroom breaks, lunch, and patient documentation time, a ten or eleven billable day now turns into a twelve or thirteen-hour workday.  HB is not open for twelve to thirteen hours each day.  CW3 has revealed to your affiant that HB physical therapists work on average less than 40 hours per week.  CW3 further revealed that physical therapist assistants are paid hourly and may occasionally earn overtime after working 40 hours in a week.  Less than forty-hour work weeks don't match physical therapist billings at HB of ten to twelve hours each day.   While the analysis did not show that every day was an eight/ten/twelve-hour billable day, the sheer number of them, combined with the amount of time needed for physical

therapist or physical therapist assistant documentation or lunch breaks and other non-billable time, reveals the high likelihood that HB's billing is significantly inflated and willfully and illegally erroneous. Your affiant's data analysis did not reveal anything different than what CW1 and CW3 reported and in every regard revealed that the statements, factual assertions and documentation provided by CW1 and CW3 are accurate.

82. Your affiant has spoken with two medical insurance providers regarding how they perform their own internal investigations. Both insurance providers conduct investigations into health care providers and look for billings that are out of the ordinary - for example, billing ten hours in a four-hour window. Both providers advised they routinely examine and data mine their records, but their information is limited. They can only examine their own data and do not always see billings for other health insurance providers. For example, in a given day, provider A might see four hours of billings. What they don't see is that the same physical therapist billed four separate health insurance providers, four hours each during that same day. The total time billed by the physical therapist was really sixteen hours, not four and each medical insurance company has little to no way of knowing that the physical therapist is billing in such a manner.

83. Highmark insurance researched their own internal records and determined how HB ranked among other physical therapy practices within Highmark's provider base. The dates searched were from January 1, 2014 through November 1, 2020. Highmark has provided that data to the FBI. The overall results illustrate that HB is near the very top of all physical therapy practices relative to one-on-one CPT billings. For CPT 97110, HB was the 12th highest out of 3,810 other practices. Even more noteworthy, HB was 4th out of 3,299 other practices for CPT 97140. And the most remarkable of all is CPT 97113 (aquatic therapy), where HB is number 1 out of every other Highmark provider (450 total). Overall, when there is a one-on-one CPT that

can be billed, HB is near the top.  While it is possible that HB is one of the largest physical therapy practices within Highmark's network, what is astonishing is that HB can bill for so many one-on-one services while billing for absolutely zero group therapy sessions (group therapy CPT code 97150 was billed on three occasions in 2014 and not billed since).

84.    The salaries for Aaron Hertel and Michael Brown were obtained through the Pennsylvania Department of Labor (DOL).  In 2019, the last year full data was reported on, Hertel made approximately $318,454 and Brown made $341,139.  Further, since Hertel and Brown own HB, HB may make a profit or loss each year that may not be reflected in DOL figures for Hertel and Brown.  In addition, Hertel and Brown could take owner withdrawals that again would not be reflected in DOL figures.   In the hundreds of white-collar investigations your affiant has investigated, or been part of, your affiant does not recall ever investigating or charging a business owner who drew a small salary (income).

85.    CW2 told your affiant that Medicare reimbursement rates are designed to allow a physical therapy business to make money.   With any business, the owners need to adhere expenses to revenue and adjust accordingly.  Medicare states the following: "The cost of supplies (e.g. theraband, hand putty, electrodes) used in furnishing covered therapy care is included in the payment for the HCPCS codes billed by the physical therapist, and are, therefore, not separately billable."  CW2 also stated Medicare reimburses differently in Erie than Philadelphia due to Philadelphia's higher expenses, including liability insurance.  CW2 informed your affiant that the Medicare reimbursement rate takes unbillable time into account.  For example, when a patient's visit has ended, the performing PT needs to document the patient care, record the billable time, and do any other necessary paperwork.  This time is not billable, but Medicare has taken this time into account and factored in a reimbursement rate that should allow the business to operate.  CW2

told your affiant that using technicians/aides/supportive personnel is an easy way to reduce expenses and when utilized fraudulently, high profits can be made. Simply put - why pay someone $60,000 a year or more, when you can pay someone $20,000 and get the same billable hours at the same rate.

86.     CW3 was interviewed by your affiant twice in January 2021. He/she currently works as a licensed physical therapist at HB. During the interviews, CW3 revealed that HB utilizes aides (unlicensed personnel) to perform duties that only a licensed physical therapist or physical therapist assistant can lawfully perform. CW3 also revealed that it was a pattern and practice at HB for physical therapists to record billable time for patients that were treated by unlicensed personnel. CW3 also indicated that treatment performed by unlicensed aides was regularly recorded as one-on-one treatment time with a physical therapist and billed under a one-on-one physical therapist treatment code such as CPT 97110 (therapeutic exercise). CW3 also revealed that the physical therapists would regularly instruct the unlicensed aides about the treatment the unlicensed aides were to perform, and that treatment would then be performed by the unlicensed aide without the oversight of the physical therapist. This unlicensed activity undertaken by the aide would then be recorded as time spent by a licensed physical therapist or physical therapist assistant. CW3 indicated that not every HB patient is treated by an unlicensed aide. However, according to CW3, it is common for unlicensed aides to be providing treatment at HB. CW3 was trained at HB that it is acceptable for aides to engage in treatment activity. CW3 also indicated that Aaron Hertel and Michael Brown are fully aware that unlicensed aides are engaged in treating patients at HB.

87.     In 2018, CW4 tried utilizing a physical therapy practice on State Street in Erie, Pennsylvania (CW4 could not recall the business name) that he/she had previously used. However,

CW4 discovered it had closed, so instead, CW4 went to HB's Harborcreek location for physical therapy treatment since it was near his/her home. CW4 revealed to your affiant that HB operated differently than the State Street physical therapy practice where he/she had previously been a patient. At the State Street practice, CW4 only saw one physical therapist, while at HB, CW4 was treated by numerous different employees. CW4 advised HB would treat him/her using two different "teams." CW4 labeled them the "A" team and "B" team. CW4 gave the labels respective to the level of care and expertise each had, with the "A" team being the better of the two. At each visit, a "B" team employee would greet him/her, walk him/her back to a treatment room or piece of equipment. The "B" team employee would typically place an electronic stimulation (stim) device on his/her person, followed by a hot or cold pack. The "B" team employee would then begin CW4's exercise treatment. The "B" team employee would typically have a sheet of paper that listed the exercise program that CW4 needed to perform. CW4 heard at least one employee say these were the exercises that "Phil" wanted CW4 to perform. CW4 examined a photograph of P.S. displayed on HB's website. CW4 stated he/she recognized that person to be "Phil". CW4 examined the rest of the photographs and advised none of them were the "B" team employees. CW4 advised "Phil" was an "A" team employee and would only come in to visit CW4 once the "B" team employee(s) were finished. According to HB's website, P.S. is a licensed physical therapist who received a physical therapy degree from Gannon University in 2018.

88.     CW4 only saw "Phil" for around 10 minutes each visit. Prior to "Phil", CW4 would receive approximately 10 minutes of stim/pack treatment and another 15 minutes of exercise treatment. Sometimes the "B" team employee would stay with CW4, other times they would leave him/her unattended. When CW4 was left without supervision, CW4 would see these other "B" team employees treat other patients. During any typical appointment, CW4 would see around 10

other patients receiving treatment.  CW4 described the HB Harborcreek location as very busy, pushing through patients, with an emphasis on making money through volume.  CW4 advised no employee ever offered up their position at HB (stating whether they were an unlicensed support employee), although one "B" team employee advised she was a student when CW4 engaged her in small talk.  CW4 assumed each was a licensed employee able to provide physical therapy treatment.  CW4 advised he/she had Highmark Insurance and utilized his/her insurance for their treatment at HB.

89.     Your affiant has examined HB's Highmark Insurance records for 2018.  Over 15 different days' (visits) worth of billing records for CW4 were found.  On almost every occasion, both CPT 97110 and CPT 97140 were billed to CW4's insurance.  Further, on every one of these occasions, except one, a total combination of 45 units (minutes) of 97110 and 97140 were billed. As detailed previously, insurance is billed in 15-minute increments (units).  By CW4's estimation, he/she only spent around 25 minutes receiving treatment (not including stim pack/hot cold pack treatment).  While HB is allowed to round up treatment minutes, as detailed previously in this affidavit, this does not account for the wide discrepancy in treatment minutes.  CW4's estimates are about half of what was billed.  Furthermore, CW4 advised he/she was only seen by "Phil" for around 10 minutes.  The other treatment time was performed by other unlicensed HB employees, one of which was a "student" and CW4 indicated none of the "B" team employees were listed on HB's website (CW3 indicated that aides/technicians are not listed or displayed on HB's website).

90.     On February 11, 2021, FBI Special Agent Valentino Cuba, working in an undercover capacity, visited the West Erie Plaza HB location during normal working hours.  After entering the office, SA Cuba asked a HB employee if he could get a tour of the facility to see what treatment options were available.  A HB employee offered to give him a tour and walked him

around showing him the different areas and treatment options HB provided.  While walking around, SA Cuba noticed upwards of 20 patients.  Several patients were using various pieces of equipment, many of them doing their "own" treatment/exercise program without supervision.  SA Cuba was not allowed into the private patient rooms and could not see if they were occupied.  Several additional patients were either checking out or sitting in the waiting area chairs near the front entrance.  SA Cuba witnessed several young females, who all wore the same black shirts, working with patients.  SA Cuba also noted four different HB employees working with patients.  SA Cuba did not receive treatment and only walked around the facility, leaving a few minutes later.

91.     SA Cuba examined the HB website and each photograph displayed.  Although each employee wore a mask when SA Cuba visited the West Erie Plaza HB location, SA Cuba was able to determine that none of the HB female employees wearing black shirts had their photograph displayed on the website.

92.     SA Cuba's observations match what CW3 and CW4 describe.  Numerous patients present at HB, some being seen or treated by HB employees, while many others were not being attended to by HB personnel but rather appeared to be engaging in solitary treatment activity. The HB website lists eight different licensed HB employees working at the Erie Plaza location.  SA Cuba only saw four but witnessed upwards of 20 patients.

93.     Your affiant interviewed CW1 on February 17, 2021.  He/she confirmed all the information about HB that he/she had previously provided.  CW1 also revealed that he/she is currently prescribed three different medications for mental health related issues.  CW1 also stated that he/she had been hospitalized for mental health related issues within the previous year.  During your affiant's discussion with CW1 he/she appeared alert and oriented and did not appear to be

suffering from mental health problems.  CW1 also revealed that he/she currently works as a corrections officer in Northeast Ohio and works approximately 120 to 140 hours every two weeks. CW1's mental health issues have not impacted his/her ability to maintain his/her present employment.  CW1 has no prior criminal history and has revealed that he/she was the valedictorian of his/her high school graduating class.

94.     On February 21, 2021, Chief United States Magistrate Judge Cynthia Reed Eddy signed search warrants for the five HB locations along with a warrant for HB's account at WebPT. Those warrants were executed on February 23, 2021. During the execution of those warrants, investigators seized evidence relevant to the investigation.

95.     During and after the execution of the search warrants at HB's five locations, investigators interviewed HB employees. One of the HB employees, referred to in this affidavit as CW5, is a licensed physical therapist. During the interviews, CW5 revealed that both Aaron Hertel and Michael Brown prioritize profit. CW5 further indicated that Aaron Hertel and Michael Brown employ and personally utilize unlicensed technicians to perform work for themselves and/or other licensed physical therapists or physical therapy assistants. According to CW5, the Hertel & Brown practice does not employ enough licensed physical therapists and without the technicians, HB could not bill insurance providers, including Medicare, for the high numbers of patients they treat each day. CW5 stated that employees looked the other way as Aaron Hertel and Michael Brown owned the practice and were the ones that signed CW5's and the other employees' paychecks. CW5 further revealed that the practice of utilizing technicians to treat patients and billing that time as if a physical therapist or physical therapist assistant performed the treatment has been ongoing at HB for many years.

96.     On March 2, 2021, your affiant spoke with CW6, who is currently a licensed physical therapist. CW6 was employed with HB as an unlicensed technician starting in 2008 and continuing for several years. While CW6 was employed at HB as an unlicensed technician, CW6 worked in the pool providing treatment to HB patients. CW6 would complete his/her treatment and either Michael Brown or Aaron Hertel would then complete the billing paperwork as if they had performed the treatment that CW6 actually provided to the patient. CW6 stated that HB utilized him/her in the pool to provide treatment even though he/she was an unlicensed employee. CW6 advised he/she began to provide aquatic therapy treatment when he/she first started at HB as an unlicensed technician in 2008. CW6's information indicates that fraudulent billing practices have been occurring at HB since at least 2008, not long after inception of the practice in 2007.

97.     On April 27, 2007, Aaron Hertel signed a contract with Aetna Insurance authorizing Hertel and Brown to provide physical therapy services for Aetna customers. The contract specified the following: "Each provider at Facility (HB) who is a Therapist ("Provider") providing services to Members must be a graduate of an accredited school of therapy appropriate to the specialty and licensed by the state licensing board in the state in which Provider practices." Furthermore, Aetna issued two policies (Policy Number 0325 and 0174) that stated Aetna will only reimburse the contracted provider when a licensed therapist has performed the services. According to the Aetna policies, services that can be safely and effectively furnished by non-skilled (non-licensed) employees are non-skilled services and not billable. The Aetna contract, which Aaron Hertel signed in April 2007, put Aaron Hertel and HB on notice that only the services of licensed employees, i.e. physical therapists and physical therapist assistants, could be billed to Aetna.

98.     During the search of the West Erie Plaza HB location on February 23, 2021, agents forensically copied contents from a laptop computer inside the West Erie Plaza HB location.  The

computer was in the back-office area.  Instead of seizing the computer, a portion of the computer that appeared to contain business related documents was forensically copied on site.  An initial examination of the contents of the computer showed spreadsheets and other documents that were HB related and relevant to both the investigation and to the search warrant.  The partial mirror image of the digital contents of the laptop was taken back to the FBI and setup so it could be forensically examined.  Agents then examined the contents and found numerous business-related documents, including notes about director meetings and employee time sheets.  The director meeting notes revealed meetings were held with HB employees at least once per year.  The notes were documented by HB personnel and then saved by HB personnel to the computer.

99.     Furthermore, during the examination, agents discovered HB related documents, files, records, and data on the computer that were dated as far back as 2013.  When reviewing the contents of the West Erie Plaza HB laptop, if searching agents encountered documents, files, records and data that were outside the search parameters (date range) of the original HB search warrant for the West Erie Plaza location, searching agents stopped examining the contents of that material upon discovering that it was outside of the permitted date range.  The original search warrant authorized the seizure and search of HB documents from January 1, 2018 to present (at the time of the search).  Since the seized digital content of the HB laptop computer includes documents, files, records and data dating back to 2013, and there is probable cause that the fraud at HB has been ongoing since 2008, your affiant is seeking authorization to examine all documents, files, records and data dated between January 1, 2013 and December 31, 2017, from the seized content of the HB laptop currently in FBI custody.

100.     In conclusion, HB and its employees were involved in billing physical therapy related expenses to insurance companies, including Aetna, as far back as 2008. The billings were

contrary to and in violation of the insurance company's rules and regulations. The insurance companies were unaware as to what was happening. As noted, investigators discovered documents, files, records and data going back to 2013 on a laptop computer at the West Erie Plaza HB location. Since investigators have discovered likely criminal conduct going back to at least 2008, investigators seek authorization to examine the documents, records, files and data dated between January 1, 2013 and December 31, 2017, within the material already seized by the FBI from the HB laptop computer. Furthermore, investigators will only examine those files that appear to be HB related and are within the scope of Attachment B.

### Request for Sealing and Nondisclosure

101.    This criminal investigation is ongoing. While the existence of the general investigation is public, I believe that prematurely revealing the specific details, facts, and reasons for the searches, as detailed in this affidavit, may cause further flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and otherwise seriously jeopardize the investigation (e.g., prompting changes in behavior or notifications of confederates). In particular, given that the target of the investigation is known to use computers and electronic communications in furtherance of his activity, the target could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement should he learn of the government's investigation.

102.    For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and

to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

### Conclusion

103.     Based on the information contained herein, which to the best of my knowledge I believe to be true and correct, there is probable cause to believe that HB has engaged in a pattern and practice of healthcare fraud and evidence of the Subject Crimes is located in the computer evidence seized from a laptop computer located at the West Erie Plaza HB location on February 23, 2021.  Therefore, based on the foregoing, I respectfully request that a search warrant be issued authorizing the search of the digital contents of a laptop seized on February 23, 2021 from 902 West Erie Plaza Drive, Erie, Pennsylvania for Hertel & Brown Physical & Aquatic Therapy related documents, files, records and data dated between January 1, 2013 and December 31, 2017 that are within the scope of Attachment B.

The foregoing is true and correct to the best of my knowledge, information, and belief.


_s/Michael Thoreson_____
Michael Thoreson
Special Agent
Federal Bureau of Investigation



Sworn and subscribed to me telephonically,
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
This _____ day of May 2021.



_____
The Honorable Richard A. Lanzillo
United States Magistrate Judge